# UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

**CALIFORNIA VALLEY MIWOK TRIBE OF CALIFORNIA**, a federally recognized Indian tribe,

4620 Shippee Lane
Stockton, CA 95212

*as September 22, 2019*,

14807 Avenida Central
La Grange, CA 95329,

**SILVIA BURLEY**, a duly enrolled citizen and duly elected **CHAIRPERSON** of the  California Valley Miwok Tribe of California and authorized Tribal Representative to the United States by the Tribe's General Council,

4620 Shippee Lane
Stockton, CA 95212,

*as September 22, 2019*,

14807 Avenida Central
La Grange, CA 95329,

     *Plaintiffs*,

  v.

**DAVID BERNHARDT**, in his official capacity as SECRETARY OF THE INTERIOR,
1849 C Street NW
Washington, DC 20240;

**UNITED STATES DEPARTMENT OF THE INTERIOR**
1849 C Street NW
MS-4660-MIB
Washington, DC 20240

**Case No.** 19-cv-02739

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

1

**TARA SWEENEY**, in her official capacity as
Assistant Secretary – Indian Affairs;;
1849 C Street NW
MS-4660-MIB
Washington, DC 20240,

**BUREAU OF INDIAN AFFAIRS**
1849 C Street NW
MS-4606-MIB
Washington, DC 20240

**BUREAU OF INDIAN AFFAIRS, PACIFIC
REGIONAL OFFICE**
2800 Cottage Way
Sacramento , CA 95825

*Defendants*.

Plaintiffs, the California Valley Miwok Tribe of California ("The Tribe" or collectively,

"Plaintiffs") and tribal citizen, Silvia Burley—who serves as the Tribe's duly elected Tribal

Chairperson as well as the Tribe's General Council's authorized Tribal Representative to the

United States—file this Complaint against the David Bernhardt, in his official capacity as

Secretary of the Interior, and the U.S. Department of the Interior, and others, and Plaintiffs allege

as follows.

## STATEMENT OF THE CASE

1.  This action is initiated to compel the Department of the Interior, Bureau of Indian

    Affairs, and its officials to recognize the duly elected government of a federally

    recognized tribe and its authorized Tribal Representative to conduct government-to-

    government relations with the United States as mandated under federal law, which

    has been unlawfully withheld and unreasonably delayed.

2.  It is well-established that the United States Department of the Interior may not create a hiatus in the government-to-government relationship between the federal government and a federally recognized Indian tribe by failing to recognize a governing body of that Indian tribe.

3.  In this case, at least since in and around 2012, the United States created, readily admits, and perpetuates a hiatus in the government-to-government relationship and unlawfully justifies withholding recognition of a tribe's duly-elected government of a federally recognized Indian tribe, even for limited purposes, as required by law.

4.  Most recently, on or about August 16 2019, the Tribe, pursuant to 25 U.S.C. §2.8, requested the Secretary of the Interior, David Bernhardt, to take action to cure the agency's failure to take action, and to specifically remedy the unlawful withholding of recognition of the Tribe's duly-elected tribal government and its authorized Tribal Representative. Secretary Bernhardt and his Department ignored the statutory deadline and failed to respond.

5.  In June 2019, the Tribe also submitted a contract request under the Indian Self-Determination and Education Assistance Act (ISDEA) by and through its duly elected governing body.  Pursuant to the ISDEA, Defendants had ninety days to either approve or decline the contract request.  In response, however, Defendants issued a letter dated July 23, 2019, which purported to "return without action" the contract request, on the basis that the Department of the Interior has not recognized a governing body of the Tribe since at least 2015 admitting the Defendants continue to perpetuate a hiatus government.  The July 23, 2019 Letter was in violation of the

ISDEA and the Defendants' affirmative duty to recognize a tribal governing body, either on a permanent or interim basis, for government-to-government purposes.

6. Moreover, the Defendants have further eschewed their affirmative duty to recognize a tribal governing body, either on a permanent or interim basis, for government-to-government purposes by providing third parties and State courts contact information of both the Plaintiff Tribe and an a non-Indian organization for purposes of communicating and making Indian Child Welfare Act ("ICWA") determinations on behalf of the Tribe—in violation of ICWA and further perpetuating a hiatus government.

7. Plaintiffs seek declaratory judgment that the United States has abused its discretion, acted in contrary to law, unreasonably delayed agency action, and by its failure to act has acted arbitrarily and capriciously by withholding or failing to recognize a duly elected government of this federally recognized tribe since 2012, nearly a decade.

8. Plaintiffs further seek an order compelling Defendants to recognize the Tribe's governing body, comprised of Silvia Burley, Rashel Reznor, Anjelica Paulk, and Tristian Wallace, who were duly elected by the Tribe's General Council and are currently recognized by other branches of the federal government. Ms. Silvia Burley is the Tribal Representative the United States has recognized as Tribal Representative to conduct government-to-government relations with the United States in 1999, 2000, 2001, 2002, 2003, 2004, 2005, 2006, 2007, December 2010 and 2011.

## JURISDICTION

9. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 (federal question), 1346 (United States as defendant), 1361 (mandamus against

federal official), 1362 (Indian tribe as plaintiff), and 25 U.S.C. § 5331 ("ISDEA"), as hereinafter more fully appears.

10. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and under 28 U.S.C. § 1362 because this is a civil action arising under the Constitution and laws of the United States, including but not necessarily limited to the following provisions:  U.S. Const. Art. I, § 8, cl. 3 (Indian commerce clause); U.S. Const. Amend. V (due process clause); the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.* and § 701 *et seq.*; 25 U.S.C. §2.8;  28 U.S.C. §§ 2201 and 2202 (declaratory judgments); the All Writs Act, 28 U.S.C. § 1651; the Indian Self-Determination and Education Assistance Act ("ISDEAA"), 25 U.S.C. § 450 *et seq.*; 43 U.S.C. § 1451 *et seq.* (establishment and responsibilities of the Department of the Interior); 25 C.F.R. Part 900 (contracts under the ISDEAA); and the Federal common law.

11. Moreover, actions and decisions of Department of the Interior Officials provide judicial review jurisdiction over requested relief available under the Administrative Procedure Act, 5 U.S.C. §§ 701-706 and 25 C.F.R. Part 2.

12. Specifically, this Court has jurisdiction of these claims under 28 U.S.C. §1331 and 5 U.S.C. §706(2)(A) to grant declaratory and injunctive relief to Indians demanding that the United States recognize a certain tribal government under the "arbitrary and capricious" standard of the Administrative procedures Act because the final Department action subject to judicial review is its decision to recognize certain tribal officials or not.

13. This Court has jurisdiction pursuant to 28 U.S.C. § 1361, in that this is a civil action in the nature of mandamus seeking to compel an officer or employee of the United States or an agency thereof to perform a duty owed to the Plaintiffs, which duty arises under the

Constitution and laws of the United States, including but not necessarily limited to the provisions previously described.

14. This Court has original jurisdiction pursuant to 25 U.S.C. § 5331, in that this is a civil action or claim against the Secretary arising under the ISDEAA.

15. Defendants have consented to suit and Defendant's actions are reviewable and a remedy is available under the various provisions of the APA, including 5 U.S.C. § 702 (providing for judicial review of agency action under the APA), 5 U.S.C. §704, 5 U.S.C. §705, and 5 U.S.C.§706(1) (compel agency action unlawfully withheld or unreasonably delayed), §706(2)(A), §706(2)(B), §706(2)(C), and in doing so this Court "shall decide all relevant question of law, interpret constitutional and statutory provisions and determine the meaning of applicability of the terms of an agency action."

16. Declaratory relief is authorized pursuant to Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

17. 28 U.S.C. §1561 provides the Court additional authority to provide remedy as appropriate and necessary.

**VENUE**

18. Venue is proper in the District of Columbia under 28 U.S.C. § 1391(e) because the Federal Defendants are located here and the challenged agency action was made by or on behalf of the Secretary of the Interior. *See generally Alabama v. U.S. Army Corps of Eng'rs*, 304 F. Supp. 3d 56, 62 (D.D.C. 2018).

19. There is a strong nexus of the claims at issue in this case to the District of Columbia because Plaintiff's claims here "focus" on the interpretation of federal statutes" and federal common law. *See Greater Yellowstone Coalition v. Bosworth*, 180 F. Supp. 2d 124, 128-29 (D.D.C. 2001).

20. Furthermore, "[t]he Government cannot reasonably claim to be inconvenienced by litigating in this district; after all, this is its home forum." *Stewart v. Anzar*, 308 F. Supp. 3d 239, 248 (D.D.C. 2018).

21. The standards by which the United States recognizes a federally recognized tribe's government when no leadership or membership dispute exists have broad-reaching, national policy implications and therefore the Plaintiffs' choice of venue is at home to the agency.

22. Therefore, venue is proper in this Court.


## PARTIES

23. Plaintiff, the California Valley Miwok Tribe of California ("the Tribe") is a federally recognized Indian tribe.  It appears on all annual United States announcements since the enactment of P.L. 103-454, 108 Stat 4791 (1994); most recently, 84 Fed. Reg 1200, 1201 (Feb 1, 2019).  The Tribe's relationship with the United States is indicated also in the first Federal Register notices issued by the United States reporting a government-to-government relationship extending services to tribes dating back to 1972.  *See* "American Indians and Their Federal Relationship, Department of Interior," BIA (1972), *and see also* Notice, Indian Tribal Entities that have a Government-to-Government Relationship with the United States, 44 Fed Reg 7235, 7236 (Feb. 6, 1979).  *See* 60 Fed. Reg. 9250 (Feb. 16, 1995). The United States initially identified the band of homeless California Indians that would become known as the California Valley Miwok Tribe in and around 1915.

24. Plaintiff Silvia Burley is an enrolled citizen of the Tribe. She is the Tribe's duly elected Chairperson of the Tribe's governing body, its Tribal Council further designated Ms. Burley as the Tribe's Tribal Representative to conduct government-to-government relations with the United States.

25. Defendant, David Bernhardt is the Secretary of the Interior ("Secretary") and is sued here in his official capacity. Secretary Bernhardt took office on or around April 11, 2019. As the context may require, all references herein to the Secretary prior to April 11, 2019 refer to Secretary Bernhardt's predecessors in office, in their official capacities.

26. Defendant the United States Department of the Interior ("the Department") is an administrative agency of the United States. The Department is headquartered at 1849 C Street, N.W., Washington DC 20240.

27. Defendant Bureau of Indian Affairs ("BIA") is an administrative agency that exists within the Department of the Interior, and whose mission is to enhance the quality of life, to promote economic opportunity, and to carry out the responsibility to protect and improve the trust assets of American Indians, Indian tribes and Alaska Natives. BIA is headquartered at 1849 C Street, N.W., Washington, D.C. 20240. The BIA possesses secretarial delegated authority from the Secretary of the Interior to conduct government-to-government relations with Indian Tribes and carry out the United States' trust obligations to Indian tribes.

28. Tara Sweeney is the Assistant Secretary-Indian Affairs ("Assistant Secretary") and is sued here in her official capacity. The Assistant Secretary took office on or around July 30, 2018. As the context may require, all references herein to the Assistant

Secretary prior to July 30, 2018 refer to Assistant Secretary Sweeny's predecessors in office, in their official capacities. The Assistant Secretary is responsible for overall management of the BIA and, along with the BIA, is delegated authority from the Secretary to conduct government-to-government relationships with a recognized government of a federally recognized Indian tribe.

## STATEMENT OF FACTS AND ALLEGATIONS

### Legal landscape requiring recognition of tribal governments for government-to-government purposes of federally recognized tribes

29. It is a bedrock principle in federal Indian law that Indian tribes have the inherent right to determine their own membership and governing body. *See Tarbell v. United States*, 307 F. Supp. 2d 409, 424-426 (N.D.N.Y 2004) ("The question of Indian governance is a matter properly entrusted to each particular Tribe."). Due to this fundamental tenet, neither federal courts nor federal agencies have jurisdiction or authority to intervene into internal tribal matters, determine an Indian tribe's governing body or its membership. *Goodface v. Grassrope*, 708 F.2d 335, 338-39 (8th Cir. 1983).

30. However, it is also well-established that, in certain circumstances, the "BIA in its responsibility for carrying on government-to-government relations with the tribe, is obligated to recognize and deal with some tribal governing body." *Goodface v. Grassrope*, 708 F.2d 335, 338-39 (8th Cir. 1983); *see also* Felix Cohen, Cohen's Handbook on Indian Affairs at 284 n. 52. The Department of the Interior must recognize a tribe's governing body, on an interim basis at least, in cases where a federal action requires the identification of a tribal governing body. *See id.*; *Cayuga*

9

*Nation v. Tanner*, 824 F.3d 321, 329 (2nd Cir. 2016) (recognized official "for

purposes of the ISDEA contract modifications and related drawdown requests");

*Timbisha Shoshone Tribe v. Salazar*, 678 F.3d 935, 937 (Dist. D.C. 2012) (recognized

one faction for limited purpose of conducting government-to-government relations

and tribal election); *Alturas Indian Rancheria v. Salazar,* No. CIV. S-10-1997

LKK/EFB, 2010 WL 4069455, at *6 (E.D.Cal. Oct. 18, 2010) ("Long-standing

policy, as well as federal court precedent, require the Department, when faced with an

obligation to interact with a governing body during a governance dispute, to

temporarily recognize a governing body to interact with."); *see also Winnemucca*

*Indian Colony v. United States*, 837 F.Supp.2d 1184 (D. Nev. 2011) (mandating DOI

to recognize Tribal leadership after ten years being withheld under complicated

circumstances related to internal tribal affairs).

31. Normally, the Department of the Interior recognizes the last undisputed governing-

body of a tribe in the face of two or more groups claiming to comprise a tribe's

governing body. *See Poe v. Pacific Regional Director*, 43 IBIA 105, 112 (2006).

32. Furthermore, recognition by the federal government of two governing bodies of an

Indian tribe "amounts to a recognition of neither," and is similarly arbitrary and

capricious. *Goodface*, 708 F.2d at 338-39.

33. One federal action that requires the Department to identify a tribal governing body for

government-to-government purposes is the Indian Self-Determination and Education

Assistance Act ("ISDEA"), 25 U.S.C. §§ 5301 *et seq.* Pursuant to the ISDEA, only

the "recognized governing body of any Indian tribe" or a "legally established

organization of Indians which is controlled, sanctioned, or chartered by such

governing body" may enter into a 638 contract with the federal government.  25

U.S.C. § 5321(a) (request by Indian tribe); 25 C.F.R. § 900.6) (definition of a "tribal

organization"). *See Cayuga Nation v. Tanner*, 824 F.3d 321, 329 (2nd Cir. 2016)

(recognized official "for purposes of the ISDEA contract modifications and related

drawdown requests").

### Background on California Miwok Tribe's
### government-to-government relationship with the United States

34. It is undisputed that the Tribe's relations with the United States date to at least in and
   around 1915 when initially identified as a band of homeless Indians by the Indian
   Agent, John Terrell.

35. Subsequently, in or around 1916, the U.S. Congress authorized, and the United States
   purchased, approximately one acre in Calaveras County, California, for the benefit of
   12 individually named Indians for homeless Indians.

36. The Tribe and the land came to be referred to as the Sheep Ranch Rancheria, and was
   so referred, when the Bureau of Indian Affairs ("BIA") held a referendum to
   determine whether "designated" tribes "want to exclude themselves from the
   application of the Indian Reorganization Act" of 1934.

37. In or around 1935, one individual Indian was found by the BIA to be located on the
   Sheep Ranch Rancheria, in Sheepranch, CA, and the BIA recorded that individual
   voting to allow the Tribe to be included in the application of the Indian
   Reorganization Act of 1934.

38. In 2001, a formal request by the Plaintiffs, including Ms. Burley as Tribal
   Representative, prompted the Department to formally agree to change the name of the

Tribe to the California Valley Miwok Tribe of California and the Federal Defendants

granted that request. *See* 67 Fed. Reg. 46328 (July 12, 2002) (noting the name

change).

39. The Tribe is indisputably a federally recognized tribe appearing on all annual

announcements since the enactment of P.L. 103-454, 108 Stat 4791 (1994) ("the List

Act").

40. The Tribe is federally acknowledged by the United States as having a relationship

with the United States demonstrated by its listing in the Federal Register notices

reporting a government-to-government relationship extending services to tribes dating

from 1972. *See* "American Indians and Their Federal Relationship, Department of

Interior," BIA (1972). *See also* Notice, Indian Tribal Entities that have a

Government-to-Government Relationship with the United States, 44 Fed. Reg. 7235,

7236 (Feb. 6, 1979). *See* 60 Fed. Reg. 9250 (Feb. 16, 1995), and most recently, 84

Fed. Reg. 1200, 1201 (Feb 1, 2019).

41. In short, the List Act of 1994, and the Tribe's presence on the list, acknowledges the

Tribe as one that indisputably conducts government-to-government relations with the

United States.

42. A federally recognized tribe under Federally Recognized Indian Tribe List Act of

1994, Pub. L. No. 103–454, § 103(6), 108 Stat 479 (1994), is "eligible for the specific

programs and services provided by the United States to Indians because of their status

as Indians."

43. In the 1950s, the U.S. Congress enacted a series of termination acts intended to

terminate the United States' relationship with tribes, distribute rancheria and

reservation lands in California; the Act named forty (40) specific tribes. *See* California Termination Act of 1958, Pub. L. No. 85-671, 72 Stat. 619 (August 18, 1958). Congress amended the California Termination Act, in P.L. 88-419, 78 Stat 390 (August 11, 1964), authorizing the termination of all Rancherias and reservations within the borders of California.

44. In or around 1965 the United States continued its termination policy and statutory mandate by taking steps—like those against other tribes in California—to terminate the Tribe and distribute tribal lands under the California Termination Act and its amendments, crafting a plan for distribution of tribal assets of "Sheep Ranch Rancheria."

### Tribal citizenship and Governance

45. In and around 1966, the records indicate only one adult Indian, Mabel Hodge Dixie, the mother of Mr. Yakima Dixie, lived on the land that had been originally set aside in  and around 1916 by the U.S. Congress.

46. In or around 1972, it was determined that the Defendants failed to perfect the Tribe's termination and distribution of its lands were incomplete; however, that land was conveyed to Ms. Mabel Dixie in fee.

47. Because the termination of the Sheep Ranch Rancheria was never completed by the Department, the Tribe was not terminated under the California Termination Act and consequently its existence as a federally recognized tribe with an inherent governmental status and inherent body politic never ceased.

48. Despite the fact that the Tribe was both historically and federally recognized in the modern era, the BIA inadvertently failed to conduct government-to-government

relations and provide benefits and services to the Tribe until the mid-1990s and then formally in 1998.

49. In and around 1993, a probate appeal of Mabel Hodge Dixie determined that the parcel commonly referred to as "Sheep Ranch Rancheria" that was subject to the California Termination Act, and was to be conveyed in fee to Mabel Dixie's heirs.

50. In and around 1995, the Department determined that the land was to be conveyed individually only to Mr. Yakima Dixie as an individual in fee. Despite the 1995, conveyance determination, the Department failed to convey the land until in and around 2000 to 2001 to Mr. Yakima Dixie, with the assistance of Plaintiffs.

51. In and around the years 1994 to 1998, Federal Defendants considered Mr. Yakima Dixie the only citizen of the Tribe and the federal government acknowledged Mr. Dixie as the tribal representative for purposes of conducting government-to-government relations until in or around June 1999 when it recognized Ms. Silvia Burley.

52. In or around September 1995, Silvia Burley "contacted BIA for information related to her Indian heritage."

53. At the Defendant's suggestion, individual Plaintiff, Ms. Silvia Burley contacted Yakima Dixie concerning potential citizenship in the Tribe.

54. On or about August 5, 1998, Mr. Dixie signed a statement accepting Silvia Burley's enrollment in the Tribe and also enrolling Silvia Burley's two daughters, Rashel Reznor, and Anjelica Paulk, and Ms. Burley's granddaughter, Tristian Wallace.

55. In or around the first week of September 1998, Department officials met with Mr. Dixie and Ms. Burley, as recorded in a transcript of the meeting "to discuss organizing the Tribe."

56. In a Letter dated September 24, 1998, the same Department officials who met with Mr. Dixie and Ms. Burley earlier in and around September 1998, sent correspondence to the Tribe's Spokesperson Yakima Dixie, recommending that "given the small size of the Tribe, we recommend that the Tribe operate as a General Council," the Tribe should establish a governing structure through "tribal resolution."

57. In a written Tribal Resolution, dated November 5, 1998, with the further assistance of the Department, the Tribe, through Mr. Dixie and Ms. Burley as the governing body, signed Resolution GC-98-01 ("Resolution" or "Governing Document") establishing a General Council and a Tribal Council.  At that time, the Tribe elected Mr. Dixie's its Tribal Council chair and authorized Mr. Dixie to be the Tribe's Spokesperson or Tribal Representative to the United States under tribal law.

58. In or around 1998, Bureau of Indian Affairs (BIA) recognized Mr. Yakima Dixie as the then federally recognized Tribal Representative or Spokesperson

59. The November 5, 1998 Governing Document serves as the Tribe's current governing document, which establishes and depicts the Tribe's governance system under traditional law and remains the law to this day.  The Tribe's traditional governance structure is consistent with 25 U.S.C. 476(h)—"Notwithstanding any other provision of this Act—(1) each Indian tribe shall retain inherent sovereign power to adopt governing documents under procedures other than those specified in this section; and (2) nothing in this Act invalidates any constitution or other governing document

adopted by an Indian tribe after June 18, 1934, in accordance with the authority described in paragraph (1)."

60. The Tribe consists of twelve (12) citizens.[1]  No citizens have been stripped of their citizenship.

61. No current citizen is objecting to the legitimacy of the Tribe's government or leadership and if they did the Tribe possess adjudicatory mechanisms to resolve disputes internally.

62. The Tribe conducts relations with other federal agencies.

63. Since in or around May 2009, the Tribe initiated and periodically operates a United States Department of Agriculture food program and gets its distributions through another California Tribe.

64. The Tribal government currently operates and conducts government-to-government relations and carries-out statutory duties under federal statutes including Native American Graves Protection and Repatriation Act and Indian Child Welfare Act ("ICWA") including substantial communication with federally recognized tribes nationwide to ensure statutory duties are carried out and children's interests are properly protected.

65. Since in and around 2000, the Tribe is perceived to be and is contacted to be the point of contact with state, tribal, and federal officials when state government-to-government relations require coordination or consultation of government agencies including the EPA (Environmental Protection Agency), BLM (Bureau of Land

---

[1] It is not unusual for federally recognized tribes to consist of relatively small numbers. While the Navajo boast nearly 170,000 enrolled citizens, other Tribes are indeed bands of families many with less than thirty (30) citizens.

Management), FERC (Federal Energy Regulatory Commission), U.S. Customs & Southwest Border Patrol / Homeland Security, FEMA (Federal Emergency Management Agency), U.S. Army Corp of Engineers, U.S. Bureau of Reclamation, U.S. Department of Housing and Urban Development, Small Business Administration, US Fish & Wildlife Service, BIE (Bureau of Indian Education), Caltrans (California Transportation Department), and the CA Board of Equalization.

66. Since in and around 1999, the Tribe and its citizens are active participants in cultural and historical preservation activities including traditional sweats, hand-games (traditional native gambling), Big Times (traditional celebrations), and Miwok language retention as well as events and advocacy related to Water Rights; land rights. In addition, the Tribe provides coordination and consultation with Indian cultural programs and historic preservation groups including the NIHB (National Indian Health Board), NCAI (National Congress of American Indians), California Native American Heritage Commission, San Joaquin County Historical Society, California Health Benefit Exchange-Tribal Advisory Workgroup, and Hoopa Tribal Civilian Community Corps.

**The Prior Ostensible Leadership Dispute**

67. A tribal leadership dispute arose on or about April 1999 between Yakima Dixie and Plaintiff Silvia Burley.

68. Specifically, the Tribe's ostensible leadership dispute, began on or about April 20, 1999, at a General Council meeting. On or about April 20, 1999, Mr. Yakima Dixie resigned as the Tribe's Chairman by handwritten letter as well as an executed General Council resolution.

69. In or about May 8, 1999, by a unanimous vote of all adult citizens, at a duly called election, Ms. Burley became Chairperson.

70. In or around December 1999, Mr. Dixie claimed he did not resign and alleged that Ms. Burley forged the resignation documents.

71. In and around 2012, Mr. Dixie admits—upon being deposed in litigation—under oath, that, in fact, he did resign on or about April 20, 1999 and the documents signed and dated in April 20, 1999 were in fact authentic.

72. In or around June 1999, Federal Defendants recognized the Tribe's government and Ms. Burley as Tribal Representative/Spokesperson based primarily on Mr. Dixie's resignation in April 1999.

73. Despite claims by Mr. Dixie of a leadership dispute, Ms. Burley was recognized as Tribal Representative in conducting a government-to-government relationship with the United States in 1999, 2000, 2001, 2002, 2003, 2004, 2005, 2006, 2007 and December 2010 and 2011.

74. In addition, the Tribe requested and was awarded Indian Self Determination and Education Assistance Act, P.L. 93-638 contract funds to run its government in 2000, 2001, 2002, 2003, 2004, 2005, 2006, 2007 and December 2010 to 2011. It received an initial Department grant for 1999.

75. As a result of Mr. Dixie's fabricated claims, the Defendant's made determinations that would lead to litigation and Defendants withholding of recognition and express refusal to recognize the Tribe's government in 2008, 2009, January to November 2010, as well as 2012 until today.

**Defendants' years-long machinations resulting in a near decade long hiatus in government-to-government relationship with a federally recognized tribe**

76. As stated before, the Tribe adopted its Governing Document in 1998 at the recommendation of, and with the assistance of, Defendants.  For nearly a decade after the Tribe adopted it, Defendants acknowledged the Tribe's Governing Documents.

77. In March 2004, the U.S. Congress was concerned that inherent governance structure were not being recognized by the Department. To ensure that it was clear that federally recognized tribes were understood to be inherent organized under traditional governance systems and structure, written and unwritten, the Congress enacted, 25 U.S.C §476(h) (25 U.S.C. 5123(h)) Mar. 2, 2004, 118 Stat. 543. Subsection (h) commands all agencies of the United States to expressly recognize the Tribe's traditional governing documents as organizing and providing a governance system for the Tribe.

78. In or around early 2004, the BIA officials California, told the Tribe that it was required to submit a constitution and enrollment ordinance to the BIA for approval. Defendants did not provide any statutory authority or regulatory process for this assertion.

79. In good faith, the Tribe submitted a new constitution and enrollment ordinance to the BIA, per BIA's direction.

80. In response to the Tribe's submission, on or about March 24, 2004, the BIA's Pacific Regional Office issued a decision that the Tribe was allegedly "not organized."

81. Again in good faith, the Tribe attempted to organize under the IRA by submitting a petition for a Secretarial election pursuant to 25 U.S.C. §5123(a).  However, in and around 2005 and again in and around 2007, the Assistant Secretary rejected the Tribe's attempt to organize under the IRA on the basis of finding that the Tribe's

membership, at the time of five (5) was not representative of "the whole community"

Although it is well-established that Indian tribes have the sovereign right to determine

their own citizenship, the Assistant Secretary concluded the Tribe should be

composed of more lineal decedents of the original Sheep Ranch Rancheria.  Again,

the Assistant Secretary failed to identify any legal or regulatory basis for these

decisions.

82. On or about February 2008 the Defendant's withheld recognition of the Tribal

government and Tribal Representative, failed to recognize any other government and

created the first hiatus government relationship with the Tribe that lasted until in and

around December 2010.

83. Defendants found agreement from federal courts that there were individuals eligible

to participate in the reorganizing of the Tribe, presumably, if and when the Tribe

availed itself under Section 16(a) of the Indian Reorganization Act and its

accompanying regulations.  The controversy concerning the Tribe's "organization"

drew attention of a casino lobbyist, named Arlo Smith, who began representing

Yakima Dixie in support of pursuing a gaming facility near San Francisco, California

controlled by Mr. Dixie.  In support of such a gaming facility, based on information

and belief, Mr. Smith influenced U.S. Senator Diane Feinstein, sufficiently enough

for the Senator to make written inquiry on his behalf with the Defendants.  In a letter

dated August 24, 2007, Senator Feinstein—writing on behalf of Mr. Dixie's casino

lobbyist, Mr. Smith—expressed concerns to Defendants about the payments of P.L.

93-638 contract funds to the Tribe through Plaintiff Ms. Burley.  Defendants, in a

letter dated on or about February 10, 2008, reassured Senator Feinstein that the

Department would not "enter into contracts nor disburse funds for fiscal year 2008" to the Tribe, through Plaintiff Ms. Burley's government, until the Tribe was "organized."

84. Coincidently on or about February 2008, Defendants withheld recognition of the Tribe's duly elected government and its Tribal Representative.

85. While the Tribe voted in 1934 to be included in the application of the Indian Reorganization Act, Section 16(a) of the IRA, requires a tribe to act affirmatively to avail themselves of the provision to adopt an IRA approved constitution. The statutory commands of the IRA critically provides no authority for the Defendants to require or mandate a Section 16(a) process on a tribes. Section 16(a) states, *See* 25 U.S.C. § 5123(a) [previously 25 U.S.C. §476(a)] ("Any Indian tribe *shall have the right to organize* for its common welfare, and *may* adopt an appropriate constitution and bylaws . . . .") (emphasis supplied).  Section 16(h) of the IRA makes clear that Section 16(a)'s provision allowing Indian tribes to organize under the IRA is permissive *not mandatory*.  Numerous tribes in California and around the country are organized under traditional governing documents or no documents at all and have not adopted an IRA constitution under Section 16(a) of the IRA.  Furthermore, no federal statue or judicial decision, order, ruling or judgment has foreclosed the Defendants' duty to recognize a Tribal government with which to conduct government-to-government relations.

86.  "Any Indian tribe *shall have the right to organize* for its common welfare, and *may* adopt an appropriate constitution and bylaws …" 25 U.S.C. §5123(a) [emphasis supplied].

87. As noted above, Section 16(h) of the IRA makes clear that Section 16(a) is permissive and optional tribal advantage because the Tribe's current governing document, the 1998 Tribal Resolution organizing the Tribe is lawful under the IRA.

88. Numerous tribes in California and around the country are organized under traditional governing documents or no documents at all and have not adopted an IRA constitution under Section 16(a) of the IRA.

    Furthermore, no federal statue or judicial decision, order, ruling or judgment has foreclosed the Federal Defendant's duty to recognize the duly elected government of the Tribe and conduct government-to-government relations with the United States with the Tribe's Tribal Representative, Ms. Burley.  For instance, No judicial order exists to restore the Tribe, resolve the distribution issues, or mandate reorganization of the California Valley Miwok, unlike the seventeen (17) other tribes in California that were impacted by the case of *Tillie Hardwick*. *See, e.g. Tillie Hardwick v. United States,* NC-79-1710SW (N.D. Cal. Dec 22, 1983) (stipulated judgment). *See, Tillie Hardwick, et al. v. United States of America, et al.* Case #C-79-1710-SW) (directing and providing authority to the Department to restore a tribes government and assist a tribe in determining lineal descendants) does not apply to the California Valley Miwok.

89. Based on information and belief, in and around 2013, and again in and around 2017, Mr. Dixie attempted to submit a constitution to the Defendants but, in both cases, Mr. Dixie did not include Plaintiffs, Ms. Burley and the Tribe.  For this reason, BIA rejected both of Mr. Dixie's attempt to submit a constitution.

90. Based on information and belief, at no time did Mr. Dixie invoke Section 16(a) of the IRA nor it accompanying regulations found at 25 C.F.R. Part 81.

91. Based on information and belief, at no time did Defendants extend recognition to Mr. Dixie as the Tribe's Tribal Representative, even for limited purposes after in and around 1999.

92. Even after, in and around 2012, Mr. Dixie admitted to fabricating a leadership dispute, the Defendants continued to unlawfully withhold recognition of a Tribal Representative of a federally recognized tribe not even recognizing as federal law required to recognize someone for a limited purpose or period.

93. That leadership dispute ceased following the death of Mr. Dixie, on or about December 12, 2017.

94. The wile of whether the Tribe is "organized" is an admission and an unlawful jurisdiction that the Defendants choose to willfully and unlawfully withhold recognition—and continue to do so—of a duly elected tribal government and its authorized Tribal Representative which creates a hiatus government which is unlawful under federal law.

95. In a letter dated, September 11, 2017, the Department again, in response to Mr. Dixie's request to approve a tribal constitution declined to recognize any tribal government or duly elected Tribal Representative.

96. In or about December 12, 2017, Mr. Yakima Dixie died.

97. On or about December 30, 2015, the Assistant Secretary issued a decision, in response to Mr. Dixie's request to approve a tribal constitution which determined that there were three (3) historical lineages of Sheep Ranch Rancheria decedents that were

eligible to participate in an IRA election, once lawfully initiated, to *reorganize* the Tribe in accordance with 25 C.F.R Part 81. The Defendants asserted that, according to their own view of the Tribe's genealogy, roughly 250 individuals—within the three lineal groups—were eligible to participate in such an election, if lawfully initiated. On this basis, the Assistant Secretary ruled that Defendants would reject any IRA election that did not include this entire community of roughly 250 individuals. The Assistant Secretary also stated, "The United States does not recognize leadership for the CVMT ["the Tribe"] government."

98. Defendants maintained that their genealogical review necessitated their position that 250 individuals were eligible for participation in a lawfully-initiated IRA election from December 30, 2015 through May 30, 2019. During this entire time, based on information and belief, Defendants used this as an unlawful justification to perpetuate the hiatus in the government-to-government relationship between the federal government and the Tribe.

99. As a matter of clarity, the Assistant Secretary has never determined that any of the 250 individuals within the three lineal groups are, or have ever been, members of the Tribe. Rather, the only individuals who are citizens of the Tribe are Plaintiff Silvia Burley and eleven other individuals identified by Ms. Burley's government.

100. In and around October 2018 through April 2019, individuals who are not and have never been citizens of the Tribe—but who were within the three lineal categories identified in the Assistant Secretary's December 30, 2015 decision—petitioned the Department to conduct a referendum under 25 C.F.R. Part 81 to adopt a constitution of the Tribe in an effort to organize the Tribe under the IRA. Based on information

24

and belief, without prior notice or request for approval under Section 16(a) to the Tribe or Plaintiff Ms. Burley, Defendants accepted and validated the petition.

101.    Immediately upon learning of the petition, the Tribe—by and through Plaintiff Ms. Burley—challenged the petition on the basis that an IRA referendum election may only be initiated by a petition by the Tribe itself or enrolled tribal members, of which the petitioners were neither.  The Tribe, by and through Plaintiff Ms. Burley, requested that the Defendants delay moving forward with an election until the issue of whether the petition was valid was litigated.  Defendants, however, refused to delay the process.  Defendants set an IRA election for April 15, 2019.

102.    The IRA referendum election was held on April 15, 2019, over the Plaintiffs' objections.

103.    The Tribe—by and through Plaintiff Ms. Burley—timely filed a challenge of the election results to the BIA's Pacific Regional Director, according to the 25 C.F.R. Part 81 regulations.

104.    On or about May 30, 2019, Defendants did an about face.  The Pacific Regional Director issued a decision, in which she invalidated the April 15, 2019 election because of the Department's new position that the petitioners were not eligible to participate in an IRA election.  In a complete reversal of its position, Defendants now claim that the vast majority of the 250 individuals, and the three lineal categories are not lineal descendants, and now less than a dozen individuals are now eligible to participate in a validly petitioned Section 16(a) IRA Secretarial election.

105.    In validating a petition and the Secretarial election, in the Letter dated May 30, 2019, the United States chose again to defy the mandates of the law failing to meet its

obligation to recognize a duly elected Tribal government to conduct government-to-government relations.

106.    The United States also chose again to defy the mandates of the law by failing to meet its obligation to recognize a duly elected Tribal government to conduct government-to-government relations when it purposefully choose to identify Plaintiff Tribe and a non-Indian organization as contacts and decision-makers for Indian Child Welfare Act determinations.

107.    A May 14, 2019 dated Letter from the Deputy Director of Indian Services, Defendants identify the Tribe as well as a non-Indian organization as one of two entities identified to make the Tribe's Indian Child Welfare Act (ICWA) decisions.

108.    A June 26, 2019 dated Letter from the Social Service Representative, Pacific Region Defendants identify the Tribe as well as a non-Indian organization as one of two entities identified to make the Tribe ICWA decisions.

109.    Moreover, the Department in the May 14, 2019 and the June 26, 2019 Letters to non-Indian individuals involved in State court proceedings seeking ICWA determination of an Indian child, provide these third parties with the Tribe's contact information in Stockton, CA as well as contact information for a non-Indian group called, "Friends of Yakima," in Berkley, CA.

110.    "ICWA's definition of Indian child as a political classification is consistent with both the Supreme Court's holding in *Mancari* and this court's holding in *Peyote Way Church of God, Inc. v. Thornburgh*, 922 F.2d 1210, 1212 (5th Cir. 1991)." Therefore, ICWA's "Indian child" eligibility provision similarly turns, at least in part, on whether the child is eligible for membership in a federally recognized tribe." 25 USC.

§1903(4). *See Brackeen v. Bernhardt*, No. 18-11479 (opinion filed 5th Cir. August 9, 2019).

111.     Provisions of ICWA apply in State court child custody proceedings involving an "Indian child," defined as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C. § 1903(4).

112.     ICWA's implementing regulations provide that States have the responsibility of determining whether a child is an "Indian child" subject to ICWA's requirements. 25 C.F.R. §§ 23.107–22; 81 Fed. Reg. at 38,778, 38,869–73. The regulations specifically require interaction of the State courts and that of a federally recognized tribe to make membership eligibility determinations.

113.     Providing the public two contacts for ICWA, especially one entity that meets no definition of "Indian" under federal law, is untenable. "Friends of Yakima" is a non-Indian organization run by a non-Indian with no affiliation to any federally recognized tribe.

114.     ICWA mandates interaction with third parties and State-court with a political entity sufficient to sustain political character not with a BIA designee—as BIA has done so in this instance. It is this political and legal interaction between two sovereigns, States and tribes, that is critical and that Congress made clear was to happen for ICWA to work effectively.

115.     Therefore, at minimum ICWA mandates that a Tribal Representative must be recognized by the Defendants. The Defendants actions violate federal law and further perpetuate the hiatus government relations with a federally recognized tribe.

27

116.    Alternatively, by and through its actions related to ICWA, the Department may be
*de facto* recognizing two entities, simultaneously, for limited purposes, and therefore,
again, the Department's action runs afoul of *Goodface v. Grassrope and its progeny*.

117.    Finally The Federal Defendants further apathy to the plight of the Tribe's duly-
elected government and its citizens is illustrated by the failure of the Secretary of the
Interior to respond to a lawful request for action under 25 U.S.C. §2.8.

118.    On or about August 16, 2018, pursuant to 25 C.F.R. § 2.8, the Tribe submitted a
request to the Secretary to take official action, or to order the Assistant Secretary –
Indian Affairs or its designee, to take official action as a result of the lack of action of
the Bureau of Indian Affairs to recognize the duly elected tribal government and the
Tribe's designated Tribal Representative.

119.    A federally recognized tribe's interest in conducting government-to-government
relations with the United States to receive programs and services are *adversely
affected* in accordance with 25 C.F.R. §2.8, and *ability to protect these interests is
impeded* when its Tribal government and representative is not recognized by the
United States pursuant to 25 C.F.R. §2.8.

120.    25 C.F.R. § 2.8, the Secretary or his designee either act on this request or establish
a date by which he anticipates to act on this request within 10 (ten) days of receipt of
this written request Letter.  If no action is taken, or if no date is established indicating
when action will be taken within 10 days of receipt of this correspondence, the
California Valley Miwok Tribe will seek judicial review of the agency's inaction.

121.    On or about August 26, 2019, the Secretary of the Interior took no action upon the
expiry of 10 day after the Office of the Secretary's receipt of the request.

122.    On or about August 30, 2019 the Secretary of the Interior failed to respond at all

to the Tribe's August 2019, 25 U.S.C. §2.8 request for action to remedy the hiatus in

the day-to-day conduct of government-to-government business with a federal

recognized tribe furthering extending the unlawful hiatus in government-to-

government relations.

123.    Throughout this time spanning from in and around 2008 to December 2010, and

then from in and around 2012 to the present, the Tribe has been deprived of the

benefits of the government-to-government relationship with the federal government,

as mandated under federal law including but not limited to P.L. 93-638 contract funds

for the purpose of funding self-government and self-sufficiency.

124.    Throughout the Defendants' machinations, spanning from in and around 2008 to

December 2010, and then from in and around 2012 to the present, the Department has

refused to recognize a Tribal governing body, despite repeated requests. In doing so

has relied upon unlawful justifications for withholding that recognition which are not

supported by statute, regulations, or case law. In doing so, Defendants have

perpetuated a hiatus in the government-to-government relationship for nearly a

decade and counting.

125.    Such failure to recognize a Tribal government is arbitrary and capricious and

otherwise not in accordance with the law and is action mandated under law and

unlawfully withheld and unreasonably delayed in violation of federal law.  *See*

*Goodface*, 708 F.2d at 338-39.


**Violation of the Indian Self-Determination and Education Assistance Act**

126.    Despite the Department's inconsistent position regarding the Tribe's genealogy, the actual citizenship of the Tribe has remained consistent.  There are twelve enrolled citizens of the Tribe, including Plaintiff Silvia Burley. The Tribe's governing body, elected by the Tribe's citizenship, is the Tribal Council comprised of Chairperson Silvia Burley, Rashel Reznor, Anjelica Paulk, and Tristian Wallace.

127.    After the Department rejected its prior position and the eligibility of the 250 individuals, the Tribe believed the Defendants would be ready to end the hiatus in the government-to-government relationship.

128.    On or about June 27, 2019, the Tribe—by and through Plaintiff Silvia Burley— submitted a 638 contract request to the BIA's Central California Agency Office.  On or about July 26, 2019, the Central California Agency Superintendent issued a decision, in which he purported to "return without action" the Tribe's June 27, 2019, P.L. 93-638 contract request.

129.    In a letter dated July 26, 2019, the Central California agency returned the Tribe's P.L. 93-638 contract proposal dated June 27, 2019, "without action." The letter stated, "[s]ince issuance of the attached decision dated December 30,2015, by the Assistant Secretary – Indian Affairs, the Department of the Interior has not recognized a governing body for the California Valley Miwok Tribe, including for purposes of contracting" under P.L. 93-638.

130.    The Superintendent therefore acknowledges and admits that Defendants have created and perpetuated a hiatus in the government-to-government relationship of a federally recognized tribe.

131.    Instead of recognizing a Tribal government, on an interim basis or otherwise, for

purposes of the P.L. 93-638 contract request, Defendants again declined to recognize

a Tribal government.

**PLAINTIFFS' CLAIM FOR RELIEF CLAIM 1—
VIOLATIONS OF FEDERAL COMMON LAW AND THE ADMINISTRATIVE
PROCEDURE ACT (APA)**

132.    Each allegation above are incorporated as if fully set forth here, by reference.

133.    The Plaintiffs need to be recognized by the United States of America in order to

conduct business with the benefits and immunities of a federally recognized tribe, to

apply for grant funds, and other important activities to protect and provide for the

economic well-being and safety of its citizens.

134.    Federal law mandates that Defendants extend to all federally recognized tribes a

recognition of a tribe's duly elected government and Tribal Representative.

135.    No law, statute, regulation, judicial order, or tribal governing document in this

matter allows, or grants, the Department, <u>as a justifiable bases of withholding or</u>

<u>failing to recognize the Tribe's duly elected tribal government the authority</u>, to

examine, determine, or require such criteria related to citizenship, membership,

Indian ancestry, heritage, ethnicity, or specifically develop a base roll, membership

roll, or determine membership for the California Valley Miwok Tribe and no such

justification exists to overcome or question whether the current Tribe's governance

system is questioned outside of, Section 16(h) of the IRA, 25 U.S.C. §5123(h)

[previously §476h].

136.    Without a government recognized by the United States, the federally recognized

tribe known as the California Valley Miwok Tribe of California, is subject to claims

by persons not citizens of the Tribe, and others, not Indians that they require membership in the Tribe.

137.    The inaction of the Defendants' is immediately reviewed and alternatively, the Secretary of the Interior's failure to respond to the Tribe's 25 U.S.C. §2.8 request is final for the agency and subject to judicial review.

138.    Under the APA, the court may hold unlawful and set aside agency action, findings, and conclusions found to be—arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706 (2)(A).

139.    The 2018 Department Decision constitutes a final agency action reviewable pursuant to the Administrative Procedure Act. 5 U.S.C. §§ 702 and 706.

140.    The Administrative Procedure Act defines inaction as action. 5 U.S.C. §551(13).

141.    The Defendants have for nearly a decade taken actions and no action to fulfill their mandatory duty to recognize a tribal government of the federally recognized tribe known as the California Valley Miwok Tribe of California.

142.    After nearly a decade without concern for the trust relationship Defendants have with roughly a dozen Indians and their well-being of the California Valley Miwok tribe is without protection. Plaintiffs and its duly elected government is the last previously recognized tribal government and Tribal Representative and the law obligates extending recognition to those governmental entities.

### PLAINTIFFS' CLAIM FOR RELIEF CLAIM 2
### Violation of ISDEA

143.    Each allegation above are incorporated as if fully set forth here, by reference.

144.    The Secretary is charged by law and the regulations with the duty to approve or decline any Indian Self-Determination and Education Assistance Act, P.L.93-638 contract request received by an Indian tribe or tribal organization.

145.    The Secretary is charged by law and the regulations with the duty to act on a self-determination contract proposal within 90 days of the proposal's submission.  If the Secretary fails to decline the contract proposal within the 90-day period, the proposal is deemed approved by operation of law, and the Secretary is required by law to award and fund the contract as proposed.

146.    If the Secretary approves a P.L. 93-638 contract request, the Secretary is required to award and fund the contract as proposed.

147.    Finally, if the Secretary declines a self-determination contract proposal, he is charged by law and the regulations with the duty to follow specific procedures in declining a contract.  If the Secretary fails to follow the declination procedures established by the ISDEA and its corresponding regulations, the proposal is deemed approved by operation of law, and the Secretary is required by law to award and fund the contract as proposed.

148.    In this case, the Tribe—by and through Plaintiff Silvia Burley, the Tribe's duly elected Chairperson—submitted a P.L. 93-638 contract request on June 27, 2019.

149.    Defendants did not award or decline the Tribe's June 27, 2019 P.L. 93-638 contract request.  Rather, Defendants purported to return the request "without action."

150.    Because Defendants did not decline the contract, it is deemed approved by operation of law as of September 27, 2019.

151.    In the alternative, in declining the Tribe's P.L. 93-638 contract request,

Defendants failed to follow the declination procedures.  Therefore, the contract

request is deemed approved by operation of law.

152.    In either case, Defendants failed to comply with and satisfy the requirements of

the ISDEA, which has unreasonably delayed fulfilling and complying with the

Defendants' duties to award and fund the Tribe's P.L. 93-638 contract request and to

disburse the associated funds.

153.    Failure to award the Tribe's P.L. 93-638 contract request is final agency action for

which there is no other adequate remedy in a court, reviewable in accordance with 5

U.S.C. §§ 704 and 706, and Plaintiffs have exhausted all administrative remedies.

154.    Such failure is arbitrary, capricious, and abuse of discretion, or otherwise not in

accordance with the law, and is in excess of statutory jurisdiction, authority, or

limitations, or short of statutory right.

155.    The relief requested in this Second Claim for Relief also is necessary and

appropriate in aid of the jurisdiction of this Court and is agreeable to usages and

principles of law, within the meaning of 28 U.S.C. § 1651.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this honorable Court grant the
following relief:

A.  Provide declaratory and injunctive relief under the laws of the United States,

including but not limited to 5 U.S.C. §§ 701-706, 28 U.S.C. 1651, and 28 U.S.C.

§§ 2201-2202; and,

B.  Pursuant to 5 U.S.C. § 706(1), declaratory relief and relief in the nature of

mandamus and a mandatory injunction compelling Defendants to recognize a

34

Tribal governing body for government-to-government purposes, including but not limited to P.L. 93-638 contracting under the Indian Self-Determination and Education Assistance Act; and

C.  Declaratory relief and relief in the nature of mandamus and a mandatory injunction compelling Defendants to recognize the Tribal Council comprised of Chairperson Silvia Burley, Rashel Reznor, Anjelica Paulk, and Tristian Wallace, which constitutes the last uncontested governing body of the Tribe, minus Yakima Dixie who has since deceased; and

D.  Declaratory relief and relief in the nature of mandamus and a mandatory injunction compelling Defendants to award and fund the Tribe's P.L. 93-638 contract request in accordance with 25 U.S.C. § 5321 and 25 C.F.R. §§ 900.18 and 900.19, and further providing that this Court shall maintain jurisdiction over the matter to enforce Defendants' compliance with such relief; and

E.  Issue such temporary and preliminary injunctive relief as is necessary to preserve the funds from redistribution or from lapsing at the end of the current fiscal year on September 30, 2019, pending the resolution of this dispute; and

F.  Injunctive relief prohibiting Defendants from further interference in internal Tribal governance or memberships matters in accordance with long-standing principles, policy, and legal precedent in the United States; and

G.  Pursuant to 25 U.S.C. § 5331, money damages, in an amount to be determined by this honorable Court; and

H.  Costs, fees and expenses, and reasonable attorneys' fees and expenses, pursuant to and in accordance with the Equal Access to Justice Act, 28 U.S.C. § 2412; and

I.   Issue all other appropriate injunctive or equitable relief necessary to provide

     complete relief to Plaintiffs; and

J.   Such other further relief as this honorable Court may deem just and proper.


Dated: 10th day of September, 2019 respectfully submitted,

**FREDERICKS PEEBLES & PATTERSON LLP**

By _____

Peter D. Lepsch, Bar No. 495548
plepsch@ndnlaw.com
John Peebles, Bar No. NE15730
jpeebles@ndnlaw.com

Fredericks, Peebles & Patterson LLP
2020 L Street, Suite 250
Sacramento, CA
(916) 441-2700

*Attorneys for the California Valley Miwok Tribe of California and Silvia Burley*